ALENKOWSKY v. TEXAS & N. O. RY. CO.
(No. 601.)

(Court of Civil Appeals of Texas. El Paso.
Oct. 12, 1916.)

1. RELEASE ⊕═17(2) — EFFECT — INJURIES TO
SERVANT—AVOIDANCE.

Where the injured servant, on being told by
physicians in the master's employ that his
broken bones had set, and that his limb would
be as good in a couple of months as ever, sign-
ed a release on payment of a certain sum, and
the injury was in fact unhealed, and probably
would never heal, he could avoid the release and
sue for his injuries; the physicians' statement
being a positive one as of an existing fact and
not a mere opinion.

[Ed. Note.—For other cases, see Release, Cent.
Dig. § 32; Dec. Dig. ⊕═17(2).]

2. RELEASE ⊕═17(2)—INJURIES TO SERVANT—
EFFECT—AVOIDANCE.

The rule that a false representation by the
employer's surgeon as to physical condition of
the servant will not justify avoidance of a re-
lease where the surgeon has no connection with
the settlement, and the claim agent was igno-
rant of the representation, has no application
if the claim agent procured the representation.

[Ed. Note.—For other cases, see Release, Cent.
Dig. § 32; Dec. Dig. ⊕═17(2).]

3. RELEASE ⊕═58(6)—AVOIDANCE—QUESTION
FOR JURY.

Where the pleadings raised the issue of va-
lidity of a release for injuries given by the em-
ployé on representations of the employer's sur-
geon that he would soon be as well as ever,
such issue was for the jury.

[Ed. Note.—For other cases, see Release, Cent.
Dig. § 114; Dec. Dig. ⊕═58(6).]

Appeal from District Court, Harris Coun-
ty; Wm. Masterson, Judge.

Action by Ezrel Alenkowsky against the
Texas & New Orleans Railway Company.
Judgment on peremptory instruction for de-
fendant, and plaintiff appeals. Reversed and
remanded.

Graves & Graves, of Houston, for appel-
lant. Baker, Botts, Parker & Garwood, Lane,
Wolters & Storey, and Paul Kayser, all of
Houston, for appellee.

HIGGINS, J. Alenkowsky was an em-
ployé of appellee, and on September 7, 1913,
while in the discharge of his duties, his left
leg was broken about halfway between the
knee and ankle. It was alleged that such
injuries were caused by appellee's negligence.
He was immediately taken to defendant's
hospital, and remained there until about Feb-
ruary 10, 1914, under the care and treatment
of defendant's surgeons, Drs. Knox and E. J.
Hamilton. On Dec. 1, 1913, he accepted from
the defendant the sum of $600, and in consid-
eration thereof gave a written release of his
claim for damages. In avoidance of this re-
lease the plaintiff alleged:

"That for the purpose of procuring said re-
lease and of inducing plaintiff at that time and
under those circumstances to make such nom-
inal settlement, he was taken by defendant rail-
way company's claim agent, one ―― Davis,
to its chief surgeon, Dr. R. W. Knox, and to

his assistant, Dr. E. J. Hamilton, who together
had charge of said hospital, and of plaintiff
and the medical treatment of him, and then and
there procured from each of them, in plaintiff's
presence, the statement and representation that
plaintiff was not permanently nor seriously
hurt, and that the bones in his leg had proper-
ly knitted and united together, that the leg was
not hurt, and within two months' time would
be as good and as strong as it ever was, and
that he was on the safe side and could safely
make said nominal settlement, and that it was
a good settlement for his injuries; that said
claim agent used said physicians and their said
statements and representations, repeating and
reciting same to plaintiff, and then and there,
upon the basis thereof and faith therein, in-
duced him to make said settlement and to sign
said release; that he relied upon said state-
ments and representations as to the state and
condition of his injuries and believed them to be
true, and would not have agreed to said settle-
ment, nor signed said release if he had not so
believed and relied upon the same. But plain-
tiff now shows to the court that said release is
not valid nor binding upon him, and that he
was misled and overreached to his injury in so
agreeing to and executing same, for the reason
that said statements and representations were
not true, that the bones in his leg had not then
properly knitted and united together, nor have
they yet, nor will they ever do so, nor was or is
said leg unhurt or as good as ever, but the same
was then, and is now, permanently and incur-
ably crushed, injured, and impaired, and leaves
him for life deformed, a cripple, and unable to
do any constant or heavy work, and that its
condition and the character of his other injuries
are in fact as is alleged in paragraphs 8 and 9
of this petition."

The cause was tried before a jury, and
upon the conclusion of plaintiff's evidence a
peremptory instruction was given in favor
of defendant upon the theory that an issue
had not been raised with respect to the valid-
ity of the release. In accordance with this
instruction a verdict was returned and judg-
ment rendered in defendant's favor, and the
plaintiff prosecutes this appeal therefrom.

Plaintiff testified:

"After my injury I was taken to the Southern
Pacific Hospital in the ambulance. I didn't
ask anybody to send me to the hospital. The
hospital belongs to the shops. I stayed there
five and one-half months, and was treated by
Dr. Hamilton and Dr. Knox, who are the rail-
road physicians. I didn't ask for them. They
used to come to the hospital every day while I
was there. Both bones in my leg were fractured,
my left leg, and there was a laceration of the
knee on my right leg. No other doctors ever
treated me. * * * The railroad company
paid me $600 for this accident. On the 1st of
December, 1913, Mr. Davis, the claim agent, of-
fered me $500, and suggested that I call in
some friend of mine to consider this matter.
I called in Mr. Ditch, who came, and we went
up to Mr. Davis' office. I said that my leg was
still hurting me, and I could not use it. Mr.
Davis suggested that we go down to the doctor's
office, two floors below his office. Dr. Knox ex-
amined my leg, and told me that in two months
my leg would be in perfect condition as if it
was never hurt; that at the time it was still
raw, but at the end of two months I would not
know I was ever hurt. I went back to Mr.
Davis' office with Mr. Ditch, and Mr. Davis
then offered me $500 on the strength of the
doctor's statement that my leg was in good con-
dition. When I still complained that my leg

was not well, Mr. Davis said that he would give me another $100, but I didn't consent to do that, because I wanted to make sure that my limb would be well. I then left the office with Mr. Ditch, and coming out we met Dr. Hamilton. Mr. Ditch then asked Dr. Hamilton for advice whether to accept this money—particularly, if the leg would be well in the future, then would he advise him to accept the money. Dr. Hamilton stated that this leg is in good shape, and that it was only for a short while that it would hurt any, that after that period he would not know that he was ever hurt, and advised him to make the settlement. This was the same day the settlement was made. I went up to Mr. Davis' office when I agreed to that, and he gave me a closed envelope and directed me to some other building. I don't even know which it is. I came up there, and some one read something to me that I didn't understand and asked me to sign it, and I signed it; then I went up to Mr. Davis' office and I got my check. Mr. Ditch was present during all of this time. Mr. Ditch went with me to the doctors. I accepted the statement of the doctors that my leg would be in the same condition in two months that it had been. I certainly would not have accepted the $600 if I had not believed the doctors were correct in their statement. Every time I talked with Mr. Davis, the claim agent, about my case or its settlement, Mr. Ditch was with me. Mr. Davis advised or suggested to me to go to see Dr. Knox or Dr. Hamilton. * * * The settlement was agreed upon, and the $600 was paid over to me, and the release to the company for all damages for my injury was executed by me on the day the settlement was agreed upon, December 1, 1913. I saw Dr. Knox at his office that day. At first Mr. Davis offered me $500. After he had spoken to Dr. Knox, he offered me $600. I did not hear what Mr. Davis said to Dr. Knox. He spoke to Dr. Knox in a place where I couldn't hear what was said. Dr. Knox examined my leg in the presence of Mr. Davis. Dr. Hamilton stood by, but he didn't examine me. He just watched Dr. Knox make the examination. Dr. Hamilton at that time said nothing. After leaving Dr. Knox's office I went back to Mr. Davis' office, where he offered me $600. Mr. Ditch and I went down, and we met Dr. Hamilton as we were leaving the building. At that time I had not accepted Dr. Knox's advice, and I had not decided to accept the $600. I asked Dr. Hamilton that, since I was offered $600 in settlement of the case, I wanted to know whether my leg would be in the same condition as it ever was, then I would accept these conditions, and he said that my leg in two months would be in perfectly good condition as it ever was. Dr. Hamilton had examined me before, but that day he merely watched Dr. Knox examine me. He had examined me about one day before that. I talked to Dr. Knox in the Southern Pacific Building, on the floors below Mr. Davis' office. I came from the hospital on crutches that day. On that day Mr. Ditch was with me all of the time. When they told me my leg was in good condition, I decided to accept the offer. The doctors told me that the leg was just weak now; that it would be in perfect condition. They told me that there was a union, and the fracture had grown together."

Mr. Ditch, a friend of the plaintiff, was present when the doctor's examination was made and when the negotiations to settle were had with the claim agent, Davis. He testified:

"Before going to Dr. Knox's office, we had been offered $600. Dr. Knox's office is in the Southern Pacific Building, and I and Mr. Davis and Alenkowsky went down there to that of-

fice. I did not talk to Dr. Knox. Mr. Davis brought Alenkowsky to the doctor, and the doctor examined his leg. I only stood by. I did not say anything then to Dr. Knox. I heard what the doctor said when he examined his leg. Mr. Alenkowsky was' the man what he talked to. Alenkowsky was talking to him. The doctor said: 'His leg is all right; in a month or so he will be just as well as ever.' Yes, sir; that is all he said. Dr. Knox said: 'His leg is all right; he is only weak in his leg from the break, but that he will be all right in a month or so; he will be just as well as ever.' Yes, sir; that is all he said. Yes; Mr. Davis said something. Mr. Davis said he would settle. Mr. Davis was there when he examined him. I did not hear Davis say anything. He did not say anything in the doctor's office."

Dr. Gavin Hamilton, witness for plaintiff, testified:

"I examined the plaintiff's leg some time ago, about three or four months ago, and again on the 20th or 21st of December. He had a fracture of both bones in his leg. The smaller bone had united with about a half inch overlapping. The right bone was still ——, showing that there was not a bony union, but the union was fibrous. The larger bone was considerably bowed from the shortening of the smaller bone. The small bone is overlapped, but united. I took X-ray pictures (which the witness here identifies). In them is shown the lower end of the callous around it. There is a certain amount of movement in the joint, and when the bone is bowed the shortening leaves lesser space. The smaller bone runs along the side of the larger one, and is on the outer side of the leg. The large bone carries most of the weight of the body. The picture shows the most bowed condition of the larger bone. In the smaller bone there seems to be a firm union, but the ends are overlapped about half an inch. There is a swelling over the side of the fracture of the big bone, and a certain amount of mobility. There was fibrous union there. There was no bony union. There should be no motion at the fracture. The joining together of the small bone shortens the leg and renders the condition of the larger bone such that it cannot heal. The two fragments have to bow, instead of being straight. I measured the shortening, which was about half an inch. A half inch 'shortening makes practically little difference in a man's leg. He can walk, and walk so you cannot even notice him limp, but the lack of bony union in the leg makes it so he cannot do manual labor, and he could not walk without pain, some pain. Of course, the large bone, with the ends in that position, maintains the support, but he could not walk without pain, and the weakness of the leg makes it so he could not be a laborer at all. I don't see how a man could work with his leg in that condition.

"I believe his injury will be more or less permanent unless his leg is operated on. I believe he will have to have something done to bring about a bony union. I don't believe there has been a bony union since the leg was fractured. His leg bowed like it is, even if united by a firm bony union, would still be lessened in efficiency, and be more liable to a fracture. It should not cause him pain if there was a bony union; not at the fracture, though it might in the ankle joint. Without bony union, it would cause him pain."

[1] The pleading and testimony quoted bring the case within the rule announced in Railway Co. v. Brown, 69 S. W. 651, Railway Co. v. Bright, 156 S. W. 304; Railway Co. v. Reno, 146 S. W. 207; and Wingfield v. Railway Co., 257 Mo. 347, 166 S. W. 1037.

Dr. Knox's statement, testified to by plain-

tiff, that the fracture had united and the leg in good condition was the positive statement of an existing fact. It carried the idea that a proper bony union had been effected, which is contradicted by Dr. 'Gavin Hamilton. It was not a mere statement of opinion such as was considered in Railway Co. v. Kramer, 141 S. W. 122.

[2] Appellee also invokes the rule announced in Railway Co. v. Huyett, 99 Tex. 630, 92 S. W. 454, 5 L. R. A. (N. S.) 669, that a false representation by a railway surgeon as to the physical condition of an injured party will not justify the avoidance of a release of damages where the surgeon had no connection with the settlement, and the claim agent was ignorant that such representation had been made. This rule is inapplicable here, because it is apparent that the claim agent had full knowledge of the representation, and both parties apparently acted upon the faith thereof.

[3] An issue having been raised respecting the validity of the release, it was error to refuse to submit the same to the jury.

Reversed and remanded.